T.C. Memo. 1996-93


UNITED STATES TAX COURT


ESTATE OF JAMES F. HALL, JR., DECEASED, HARRIETT HALL, EXECUTRIX,
AND HARRIETT NIXON HALL, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 26270-92.                    Filed March 4, 1996.


Neal A. Sanders and Gerard J. Serzega, for petitioners.

Julia L. Wahl, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge: Respondent determined a deficiency of
$287,624.41 in petitioners' 1988 Federal income tax.

The issues for decision are whether petitioners properly
excluded from income the 1988 distribution from the Hadd-Too,

Inc., Pension Plan under section 105(c)[1] and, if not, whether petitioner Harriett Nixon Hall is entitled to relief from liability as an "innocent spouse" under section 6013(e).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.  At the time of the filing of the petition in this case, petitioners resided in Carnegie, Pennsylvania.[2]  Petitioner James F. Hall, Jr., died on January 12, 1994, after the petition was filed but before trial.  His estate filed a Motion for Substitution of Party and to Change Caption, which was granted by the Court.

Together petitioners owned 100 percent of the stock of Hadd-Too, Inc. (Hadd-Too).  Hadd-Too adopted a defined benefit pension plan (Plan or Hadd-Too Plan) and trust, effective January 1, 1981, which was subsequently amended and restated, effective January 1, 1984.  The Plan was a qualified plan within the meaning of section 401(a).  On November 19, 1986, Hadd-Too resolved to terminate its Plan, effective December 31, 1986,

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]At the time they filed their petition herein, petitioners were involved in divorce proceedings and did not reside together.

because it believed that the Plan was overfunded and that by terminating the Plan, it would permit the company to distribute Plan assets without violating new funding limits under the Tax Reform Act of 1986.  However, the Plan assets were not completely distributed until 1988.

During 1987 and 1988, the IRS audited the Hadd-Too Plan. During the course of this audit, Hadd-Too and Mr. Hall were represented by attorney Susan Foreman Jordan.  Ms. Jordan represented Mr. Hall and the company in pension matters from the fall of 1984 until sometime after March 1989.  The IRS determined that Mr. Hall engaged in prohibited transactions with respect to certain Plan assets and that Mr. Hall was required to make restitution to the Plan or face liability for excise taxes.  The IRS agreed to resolve the audit issues by having the Plan distribute all its assets to Mr. Hall, who was the sole participant in the Plan in 1988, rather than requiring Mr. Hall to pay actual restitution or excise taxes.  The entire balance to Mr. Hall's credit in the Plan was distributed to him in 1988. The distribution consisted of cash and property in the amount of $1,027,229.45.  At the time of this distribution, the Plan was still a qualified plan within the meaning of section 401(a).

The Plan provided for the payment of retirement benefits to Hadd-Too employees.  In addition to the payment of ordinary retirement benefits, the Plan contained the following provision

for the payment of retirement benefits in the event an employee

ceased employment with Hadd-Too due to total disability:

> 4.05 <u>Disability</u>: A participant whose service with the
> Employer ceases due to a total disability for a period
> of twelve (12) months or more, prior to his normal, or
> where applicable, late retirement date, shall receive
> the actuarial equivalent of his Accrued Benefit. A
> participant is deemed disabled, if he is receiving
> Social Security disability payments or is receiving
> disability insurance payments from any duly organized
> insurance company by reason of total disability as
> defined by the payor of the disability benefit. * * *

A participant's "accrued benefit" was defined by the Plan as the

normal benefit as of normal retirement age multiplied by a

fraction, the numerator of which is the number of years of

participation in the Plan, and the denominator of which is the

number of years of participation if the participant had continued

to his normal retirement age.

At the time of the distribution to Mr. Hall, he had a

diseased foot, which later required amputation below the knee.

Mr. Hall essentially lost the use of his right foot prior to

1988. He remained employed with Hadd-Too until his retirement in

1988. As of December 31, 1988, Mr. Hall was fully vested in the

Plan.

In 1992, Mr. and Mrs. Hall separated, and Mrs. Hall

initiated divorce proceedings. They lived separate and apart

from 1992 until late 1993. At the time of Mr. Hall's death in

January 1994, however, Mrs. Hall had returned to live with and

take care of Mr. Hall, and Mr. and Mrs. Hall were still legally married.

For the taxable year 1988, Mr. and Mrs. Hall filed a joint Federal income tax return. They reported a distribution in the amount of $1,027,229 on line 17a of their return and stated that no portion of the distribution was includable in income. The return was signed by both Mr. and Mrs. Hall. Before signing the return, Mrs. Hall briefly reviewed the first 2 pages of the return. She noticed the $1,027,229 entry on line 17a, but she did not question the entry.

Mrs. Hall knew that a large distribution was made from the Plan to Mr. Hall during 1988. Of the cash distributed to Mr. Hall, $474,768.81 was transferred from the pension trust account to a newly opened bank account in 1988. The new account was held jointly by Mr. and Mrs. Hall. Both Mr. and Mrs. Hall executed the deposit agreement for the account. In addition, a certificate of deposit held by the Plan was redeemed and the proceeds used to purchase a money market certificate in the amount of $125,331.63 held jointly by Mr. and Mrs. Hall. The balance of the property distributed to Mr. Hall appears to have consisted of real property.

OPINION

Section 105(a) provides generally that amounts received by an employee through accident or health insurance for personal

injuries or sickness are includable in gross income.  Section 105(c), however, provides an exception to the general rule:

> (c) Payments Unrelated to Absence from Work.--Gross income does not include amounts referred to in subsection (a) to the extent such amounts--
>
> (1) constitute payment for the permanent loss or loss of use of a member or function of the body, or the permanent disfigurement, of the taxpayer, * * * and
>
> (2) are computed with reference to the nature of the injury without regard to the period the employee is absent from work.

Respondent determined that the exception in section 105(c) does not apply to Mr. Hall and that payments from the Plan constituted income that should have been reported by petitioners in 1988. Petitioners bear the burden of proving that they come within the exception in section 105(c).  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Section 105(e) equates amounts received through accident or health insurance with amounts received through an accident or health plan.  Section 1.105-5(a), Income Tax Regs., defines the term "accident or health plan" broadly as

> an arrangement for the payment of amounts to employees in the event of personal injuries or sickness.  A plan may cover one or more employees, and there may be different plans for different employees or classes of employees.  An accident or health plan may be either insured or noninsured, and it is not necessary that the plan be in writing or that the employee's rights to benefits under the plan be enforceable. * * *

Despite this broad definition, we have long held that the term "accident or health plan" presupposes a predetermined course of action and that it signifies something more than merely one or more ad hoc benefit payments. Gordon v. Commissioner, 88 T.C. 630, 635 (1987); American Foundry v. Commissioner, 59 T.C. 231, 238-239 (1972), affd. in part and revd. in part 536 F.2d 289 (9th Cir. 1976); Lang v. Commissioner, 41 T.C. 352, 356-357 (1963); Estate of Kaufman v. Commissioner, 35 T.C. 663, 666 (1961), affd. 300 F.2d 128 (6th Cir. 1962).

Generally, deferred compensation plans and accident or health plans serve distinct purposes. Deferred compensation plans are designed to remunerate an employee for services rendered over a substantial period of time. Accident or health plans, on the other hand, provide payments to employees in the event of illness or injury, without regard to such factors as compensation, length of service, and company profitability. Thus, in order to come within the scope of section 105, petitioners must show by "clear indicia" that the deferred compensation plan in question was intended to serve the dual purpose of providing accident or health benefits as well as retirement benefits. Berman v. Commissioner, 925 F.2d 936, 938-939 (6th Cir. 1991), affg. T.C. Memo. 1989-654; Caplin v. United States, 718 F.2d 544, 549 (2d Cir. 1983); Gordon v. Commissioner, supra at 640.

Several factors have been held relevant in determining whether a deferred compensation plan was intended to provide accident or health benefits, including: (1) A statement in a written plan that its purpose is to qualify as an accident or health plan within the meaning of the Internal Revenue Code and that the benefits payable under it are eligible for income tax exclusion; (2) specification in a plan that the benefits payable are those amounts incurred for medical care in the event of personal injury or sickness; (3) terms in a plan that limit the benefits payable to legitimate medical expenses; and (4) a provision allowing an employee to be compensated for specific injuries or illness, such as the loss of a limb. Berman v. Commissioner, supra at 939; Caplin v. United States, supra.

The Hadd-Too Amended and Restated Plan contains only two references to the provision of benefits in the event of disability. The summary description of the Plan states:

> The basic purpose of the Plan continues to be to give retirement income to the employees to supplement the benefits they will receive under the Social Security laws. The plan gives an additional measure of security to participants and their beneficiaries by providing benefits which help to insure against loss caused by disability. In addition, the Plan provides for payments to employees, under certain circumstances, if they die or terminate their employment prior to their retirement. * * *

The second reference appears in the Plan itself:

> 4.05 <u>Disability</u>:  A participant whose service with the Employer ceases due to a total disability for a period of twelve (12) months or more, prior to his normal, or where applicable, late retirement date, shall receive the actuarial equivalent of his Accrued Benefit.  * * *

None of the indicia listed above appear in the Plan, and there is no proof that there was any definite program to provide accident or health coverage that would rise to the level of an accident or health plan.

The defined benefit plan at issue in <u>Berman v. Commissioner</u>, <u>supra</u>, is remarkably similar to the Hadd-Too Plan.  In <u>Berman</u>, the defined benefit plan provided for the payment of the present value of a participant's accrued benefit if the participant became totally and permanently disabled for a 6-month period. <u>Id.</u>, at 937.  The summary description of the defined benefit plan stated:  "The purpose of the Plan is to reward eligible employees for long and loyal service to the Company by providing for their financial security at retirement.  <u>It may also provide some additional protection in the event of death, disability, or other termination of employment</u>."  <u>Id</u>. at 939.  The Court of Appeals for the Sixth Circuit affirmed this Court's holding that the plan did not constitute a dual purpose plan; rather, the permanent disability provision was merely one of several provisions that could trigger a participant's claim to accrued retirement benefits.  <u>Id</u>. at 940.  The Court of Appeals for the Sixth Circuit noted that the statement in the summary description was

ambiguous and did not provide clear indicia of a dual purpose. Id. at 939.

Petitioners rely on Wood v. United States, 590 F.2d 321 (9th Cir. 1979) and Masterson v. United States, 478 F. Supp. 454 (N.D. Ill. 1979), both holding that distributions from pension plans were excludable from income under section 105(c). These cases, however, are not controlling. See Caplin v. United States, 718 F.2d at 547-548; Gordon v. Commissioner, 88 T.C. at 636-638 (both rejecting the application of these cases under similar facts). In Wood, the status of the plan as an accident or health plan had been conceded by the Government and was not in dispute. Wood v. United States, supra at 323.[3] In Masterson, the court simply proceeded on the assumption that the distributing profit-sharing plan was a dual purpose plan without any analysis. The court relied on a statement in Wood that the precise nature and taxable status of these payments is uncertain until the funds are disbursed. Because the taxpayer received the payments after he became disabled, the court concluded that they represented compensation for a disability. Masterson v. United States, supra at 455. However, this conclusion has been criticized by this and

_____

[3]In Beisler v. United States, 814 F.2d 1304, 1308 (9th Cir. 1987), affg. T.C. Memo. 1985-25, the Court of Appeals for the Ninth Circuit subsequently clarified its holding in Wood v. United States, 590 F.2d 321 (9th Cir. 1979). In Beisler, the Court of Appeals for the Ninth Circuit stated "The Wood court itself recognized that it was not addressing the entire body of section 105(c) law. See 590 F.2d at 323 (court assumes for purposes of litigation that plan qualifies as accident or health plan)." Beisler v. United States, supra.

other courts.  <u>Caplin v. United States</u>, <u>supra</u> at 547; <u>Gordon v. Commissioner</u>, <u>supra</u> at 637-638.

We conclude that the disability provision in the Hadd-Too Plan was merely one of several events that could trigger a participant's claim to accrued retirement benefits.  Petitioners have simply failed to meet their burden of proving by "clear indicia" that the Plan was intended to serve the dual purpose of providing accident or health benefits as well as retirement benefits.  Accordingly, the $1,027,229.45 distribution received by Mr. Hall is taxable as deferred compensation and not excludable from gross income as accident or health benefits under section 105.

Even if the Hadd-Too Plan had constituted a dual purpose plan, the distribution in question fails to meet the requirement of section 105(c)(2) that the amount of any payment be computed with reference to the nature of the injury.  This requirement is met only if the plan varies the benefits according to the type and severity of the taxpayer's injury.  <u>Berman v. Commissioner</u>, 925 F.2d at 940; <u>Rosen v. United States</u>, 829 F.2d 506, 509-510 (4th Cir. 1987); <u>Beisler v. Commissioner</u>, 814 F.2d 1304, 1308 (9th Cir. 1987), affg. T.C. Memo. 1985-25; <u>Hines v. Commissioner</u>, 72 T.C. 715, 720 (1979).

Rather than computing benefits with reference to the type and severity of the injury, the Hadd-Too Plan, upon a showing of a total disability, determines the benefits solely on the basis

of the participant's accrued benefit.  The Plan makes no attempt to distinguish among the various "total disabilities", even though the types and severity of such injuries can vary greatly. Thus, the Plan fails to compute the amount of the disability payments with reference to the nature of the injury as required by section 105(c)(2).

Petitioners argue that Mr. Hall had lost the use of his right foot prior to the distribution from the Plan in 1988, and that the Plan administrators were aware of his loss and made the distribution to Mr. Hall because of it.  However, the actual disability is irrelevant to a determination of whether a plan computes the amount of disability benefits with reference to the nature of the injury.  Rather, "the instrument or agreement under which the amounts are paid must _itself_ provide specificity as to the permanent loss or injury suffered and the corresponding amount of payments to be provided."  Rosen v. United States, supra at 509 (emphasis added).[4]

---

[4]On brief, as support for their claim that the payment was computed with reference to the nature of the injury, petitioners refer to a document entitled "Informal Action and Consent in Writing by Board of Directors", dated Jan. 10, 1988, wherein the board of directors of Hadd-Too determined that Mr. Hall had presented evidence of a total disability as required under the Plan and stated that "in evaluating the degree and severity of the disability of James F. Hall, Jr., it is hereby determined that the total value of James F. Hall, Jr.'s accrued benefits in the Plan shall be paid as a disability payment from the Plan". The document was not actually prepared until March 1989, well over 1 year after its purported execution and long after the distribution to Mr. Hall.  In any event, in light of our holding that the Plan itself must calculate the benefits with reference to the nature of the injury, we find the document to be irrelevant.

Because we find that petitioners improperly excluded from income the 1988 distribution, the next issue we must decide is whether petitioner Harriett Nixon Hall is entitled to relief from liability as an "innocent spouse" under section 6013(e).

Section 6013(d)(3) provides that when a joint return is filed, the parties are jointly and severally liable for the amount of the tax due.  One exception to this rule is the innocent spouse provision contained in section 6013(e) which provides:

(e) Spouse Relieved of Liability in Certain Cases.--

(1) In General.--Under regulations prescribed by the Secretary, if--

(A) a joint return has been made under this section for a taxable year,

(B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,

(C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and

(D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.

Petitioners bear the burden of proving that Mrs. Hall satisfies each statutory requirement of section 6013(e). Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). The parties agree that the requirements of section 6013(e)(1)(A) and (B) have been met. At issue are the knowledge and inequity requirements of section 6013(e)(1)(C) and (D).

Petitioners failed to include the distribution in their reported gross income because they erroneously believed that it fell within the provisions of section 105(c). However, it is clear that when the grossly erroneous items giving rise to an understatement of tax are unreported gross income, the knowledge contemplated by section 6013(e)(1)(C) is knowledge of the transaction itself as opposed to knowledge of the tax consequences of the transaction. Purcell v. Commissioner, supra at 474; Quinn v. Commissioner, 524 F.2d 617, 626 (7th Cir. 1975), affg. 62 T.C. 223 (1974); Bokum v. Commissioner, supra at 146; Smith v. Commissioner, 70 T.C. 651, 672-673 (1978).

We have found that Mrs. Hall knew of the distribution that was made to Mr. Hall from the Plan during 1988. Mrs. Hall's claim that she qualifies as an innocent spouse stems from her misapprehension of the tax consequences and not from ignorance of the fact of the distribution. Mrs. Hall knew of the

circumstances giving rise to the substantial understatement and, thus, does not qualify as an innocent spouse under section 6013(e)(1)(C).

Moreover, we find that Mrs. Hall failed to meet the inequity requirements of section 6013(e)(1)(D). Whether it is inequitable to hold a spouse liable is to be determined on the basis of all the facts and circumstances. Sec. 6013(e)(1)(D); sec. 1.6013-5(b), Income Tax Regs. Although section 6013(e), as amended, no longer specifically requires us to determine whether a spouse significantly benefited from the omitted income, this factor is still to be taken into account in determining whether it is inequitable to hold a spouse liable. Estate of Krock v. Commissioner, 93 T.C. 672, 678 (1989). Mrs. Hall bears the burden of proving that she did not significantly benefit from the omitted income. Id.

Mrs. Hall argues that it would be inequitable to hold her liable, because she did not receive any benefit from the distribution in the form of better day-to-day living conditions. Mrs. Hall's day-to-day living conditions do not appear to have improved as a result of the distribution. However, of the cash distributed from the Plan in 1988, $474,768.81 was transferred to an account held jointly by Mr. and Mrs. Hall. Both Mr. and Mrs. Hall executed the deposit agreement for the account. In addition, a certificate of deposit held by the Plan was redeemed and the proceeds were used to purchase a money market certificate

in the amount of $125,331.63 held jointly by Mr. and Mrs. Hall. As a result, Mrs. Hall had over $500,000 of the distribution proceeds available to her in the form of joint accounts.  No evidence was presented reflecting the ultimate disposition of the funds in these accounts.[5]

The acquisition of joint saving or investment assets has been held to constitute a significant benefit, thereby precluding innocent spouse relief.  Purificato v. Commissioner, 9 F.3d 290, 294 (3d Cir. 1993), affg. T.C. Memo. 1992-580.  We believe the facts here indicate that significant funds from the distribution were available to Mrs. Hall via these joint accounts, and, therefore, she has failed to demonstrate that she did not significantly benefit from the omitted income.

Furthermore, where the understatement results from a misapprehension of the tax laws by both spouses, then both spouses are perceived to be "innocent", and there is no inequity in holding them both to joint liability.  Bokum v. Commissioner, 992 F.2d 1132, 1134-1135 (11th Cir. 1993), affg. 94 T.C. 126, 156-157 (1990); Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Lessinger v. Commissioner, 85 T.C. 824, 838 (1985), revd. on other grounds 872 F.2d 519 (2d Cir. 1989); McCoy v. Commissioner, 57 T.C. 732, 734-735 (1972).

The record indicates that both Mr. and Mrs. Hall were aware

---

[5]The balance of the distribution appears to have consisted of real property.  No evidence was offered by petitioners to show who held title to this real property after the distribution.

of the distribution of $1,027,229.45 from the Plan, that they both relied on professional advice when they filed their 1988 income tax return, and that neither of the Halls was aware of the correct tax consequences flowing from the distribution from Mr. Hall's pension plan.  Accordingly, we perceive no inequity in holding both Mr. and Mrs. Hall liable for their misapprehension of the tax laws.

<u>Decision will be entered for respondent</u>.